Argued and submitted November 10, affirmed December 30, 2020

STATE OF OREGON,
*Plaintiff-Appellant,*

*v.*

CARLOS E. ZAMORA-SKAAR,
aka Carlos Enrique Zamora-Skaar,
*Defendant-Respondent.*

Washington County Circuit Court
18CR84154, 18CR79052; A171855

480 P3d 1034

This appeal arises from a proceeding under ORS 33.055 to hold the Oregon Health Authority and Oregon State Hospital (OSH) in remedial contempt after OSH did not comply with a court order made under ORS 161.370 that required it to admit defendant to the hospital within seven days after defendant was deemed unfit to proceed in court. OSH defended against the contempt allegation based on an affirmative defense of inability to comply with the seven-day timeline. The trial court found OSH in contempt. On appeal, OSH argues that the trial court incorrectly applied the law when considering OSH's affirmative defense and also contends that the trial court made factual findings that the record does not support. *Held*: OSH has not established that the trial court based its rejection of OSH's "inability to comply" affirmative defense on an incorrect understanding of the law, and therefore OSH's argument on that ground does not present a ground for reversal. Additionally, the record is sufficient to support the factual findings that OSH challenges on appeal.

Affirmed.

D. Charles Bailey, Jr., Judge.

Carson L. Whitehead, Assistant Attorney General, argued the cause for appellant. Also on the briefs were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Laura Graser argued the cause and filed the brief for respondent.

Before DeVore, Presiding Judge, and DeHoog, Judge, and Hadlock, Judge pro tempore.

HADLOCK, J. pro tempore.

Affirmed.

**HADLOCK, J. pro tempore**

When a trial court finds that a defendant in a criminal case "lacks fitness to proceed," the criminal proceeding must be suspended. ORS 161.370(2)(a). The court then determines what will happen next. One option available to the court is committing the defendant to the Oregon State Hospital (OSH) for treatment so the defendant may gain or regain fitness to proceed. ORS 161.370(2)(a)(A), (5), (6).[1] Under the terms of an injunction entered by the United States District Court for the District of Oregon, and upheld by the Ninth Circuit Court of Appeals, OSH must admit a defendant to the hospital no more than seven days after a trial court has issued an ORS 161.370 commitment order (sometimes called a ".370 order") based on the defendant's unfitness. *Oregon Advocacy Center v. Mink*, 322 F3d 1101, 1105, 1122 n 13 (9th Cir 2003).

In this case, the trial court deemed defendant unfit to proceed. Accordingly, the court entered a .370 order committing defendant to OSH and requiring his transport to the hospital within seven days. It is undisputed that OSH was aware of the order and did not comply with it. When defendant remained in jail beyond the seven-day compliance period, defendant initiated remedial contempt proceedings against OSH and the Oregon Health Authority (OHA), which operates OSH.[2] OSH defended against the contempt allegation based on an affirmative defense of inability to comply with the seven-day timeline, given its view that admitting

---

[1] Except when specified otherwise, all citations to ORS chapter 161 provisions in this opinion are to the provisions that were in effect when the trial court entered the contempt judgment on July 12, 2019. We note that the legislature has amended ORS 161.370 since the contempt judgment was entered. However, both before and after those post-judgment amendments, an "unfit to proceed" determination required suspension of the criminal proceedings, and both before and after those amendments, one option available to the trial court was committing the defendant to the state hospital. Beyond that, the details of ORS 161.370 are not important to our analysis.

[2] OHA "operate[s], control[s], manage[s,] and supervise[s] the [OSH] campuses," ORS 179.321(1), and defendant moved to hold both OSH and OHA in contempt. However, the focus in this litigation has been almost exclusively on OSH. Moreover, neither party has argued that different legal standards apply to the two entities' potential liability for contempt, and both parties have frequently used the term "OSH" to refer to OHA and OSH collectively. We do likewise in this opinion, noting, however, that the contempt judgment reflects the trial court's finding of contempt with respect to both OHA and OSH.

more patients to OSH under .370 orders would compromise patient treatment and put patients and OSH staff at risk. *See* ORS 33.055(10) ("Inability to comply with an order of the court is an affirmative defense."). The trial court found OSH in contempt and ordered it to pay remedial sanctions of $100 per day that defendant remained in jail in violation of the .370 order.

On appeal, OSH contends that the trial court incorrectly applied the law when considering OSH's affirmative defense of inability to comply. OSH also argues that the trial court made factual findings that the record does not support. For the reasons set out below, we conclude that OSH has not established that the trial court committed reversible error. Accordingly, we affirm.

## I.   BACKGROUND:
## ORS 161.370 ORDERS AND *MINK*

For many years, it has been the law in Oregon that criminal proceedings must be suspended when the charged defendant is found to lack fitness to proceed, that is, when the defendant is found unable to "aid and assist" in the defense. *See, e.g.*, ORS 161.370(2) (2001) (with limited exceptions, when a court "determines that the defendant lacks fitness to proceed, the proceeding against the defendant shall be suspended"). *See generally Snyder v. Amsberry*, 306 Or App 439, 449, 474 P3d 417 (2020) ("The procedure[] for a determination of a criminal defendant's fitness to proceed, also known as the ability to 'aid and assist' in one's defense, is defined by statute."). And, for many years, a court that finds a defendant unfit to proceed has had the option of committing the defendant to OSH. *See, e.g.*, ORS 161.370(2) (2001) (after making an unfitness determination, "the court shall commit the defendant to the custody of [the superintendent of a designated state hospital] or shall release the defendant on supervision for so long as such unfitness shall endure"). The purpose of admitting a defendant to OSH under ORS 161.370 is—and historically has been—to provide the defendant with treatment that will allow the defendant to become fit to proceed to trial. *See, e.g.*, ORS 161.370(6)(a) (referencing "treatment designed for the purpose of enabling the defendant to gain or regain capacity" to stand trial); ORS

161.370(5) (2001) (same). *See also Mink*, 322 F3d at 1105-06 (an unfitness-to-proceed determination "triggers a process designed to evaluate, treat and restore the defendant's mental health so that judicial proceedings may resume").

Orders issued under ORS 161.370 are not the only types of orders that trial courts may issue in association with "aid and assist" proceedings. A trial court that "has reason to doubt the defendant's fitness to proceed by reason of incapacity" (but has not yet been persuaded to enter a .370 order) can enter an order under ORS 161.365 (sometimes called a ".365 order") requiring psychiatric or psychological examination of the defendant's fitness. ORS 161.365 (1)(a)(A). The court has the option of committing the defendant to OSH for that examination. ORS 161.365(1)(a)(B).

In 2002, federal litigation was initiated against OSH in which the plaintiffs alleged that OSH "was violating mentally incapacitated [criminal] defendants' due process rights by unreasonably delaying such defendants' transfer from county jails to OSH for treatment." *Mink*, 322 F3d at 1105. The district court agreed, finding that defendants were spending an average of about a month in county jails—and, in some instances, a few months—between a determination of their unfitness to proceed under ORS 161.370 (a finding of "incapacity") and when they were admitted to OSH for treatment. *Id*. at 1106. The court also found that such defendants suffered harm from the extended jail stays, sometimes including rapid decompensation, given the circumstances at the jails and the jails' inability "to provide treatment designed to restore a person found unfit to proceed to competency." *Id*. at 1106-07. OSH, in contrast, was able to provide the necessary treatment. *Id*. at 1108. The court concluded that OSH was violating incapacitated defendants' due process rights "by unreasonably detaining them in county jails that lack the facilities to treat and restore the defendants' mental health," and it "entered an injunction requiring OSH to admit mentally incapacitated defendants within seven days of the judicial finding of their incapacity to proceed to trial." *Id*. at 1107.

On appeal, the Ninth Circuit upheld the district court's injunction, noting "that by statute OSH is solely

responsible for the timely treatment of incapacitated criminal defendants so that they may become competent to stand trial." *Id*. at 1119-20. The court also was "mindful of the undisputed harms that incapacitated criminal defendants suffer when they spend weeks or months in jail waiting for transfer to OSH":

> "These harms include the following: Although jails can sometimes provide treatment to stabilize a patient, they cannot restore a patient to competency. Thus, incarceration in a county jail delays an incapacitated criminal defendant's possible return to competency. The disciplinary system that jails use to control inmates is ineffective for, and possibly harmful to, incapacitated criminal defendants. Because of their unpredictable or disruptive behavior, they are often locked in their cells for 22 to 23 hours a day, which further exacerbates their mental illness. Incapacitated criminal defendants have a high risk of suicide, and the longer they are deprived of treatment, the greater the likelihood they will decompensate and suffer unduly."

*Id*. at 1120.

In considering whether OSH was violating the due process rights of incapacitated defendants by delaying their admission to the state hospital, the Ninth Circuit held that such defendants, not yet convicted of any crime, had liberty interests both in freedom from incarceration and "in receiving restorative treatment." *Id*. at 1121. The court also observed that OSH had not established any "legitimate state interest in keeping mentally incapacitated criminal defendants locked up in county jails for weeks or months." *Id*. The court concluded that OSH violated the substantive due process rights of such defendants when it "refuse[d] to admit them in a timely manner." *Id*. at 1121-22. The Ninth Circuit therefore upheld the district court's injunction "requiring OSH to admit mentally incapacitated criminal defendants within seven days of a judicial finding of incapacitation." *Id*. at 1123.[3]

---

[3] In *Mink*, the Ninth Circuit addressed the district court's imposition of a seven-day compliance deadline only with respect to .370 orders. The court did not address whether a similar timeline would—or should—govern OSH's compliance with .365 orders. In this case, the parties litigated below whether OSH should also have only seven days to comply with .365 orders. However, that is not an issue raised on appeal, and we do not address it further.

At the contempt hearing in this case, OSH acknowledged the continuing existence and validity of the *Mink* injunction and its requirement (reflected in the .370 order in this case) that criminal defendants be admitted to OSH within seven days of an unfitness-to-proceed determination. OSH also acknowledged that it had not sought to modify the injunction based on its claimed inability to accommodate the increasing numbers of such defendants that courts were committing to OSH under ORS 161.370.

## II.   THE CRIMINAL CASE AND CONTEMPT PROCEEDING

Although not all the procedural history of this case is pertinent to the precise questions before us on appeal, we set out that history in some detail because it provides context for the issues that the parties raise. Defendant was charged with burglary and two counts of criminal mischief in December 2018. His lawyer sought a fitness-to-proceed hearing, asserting that defendant appeared unable to understand even "general [tenets] of reality," such as who he was or why he was in jail. In January 2019, the trial court entered a .365 order committing defendant to OSH for purposes of observation and examination. Defendant nonetheless remained in jail and, a week after the .365 order was entered, a social worker reported that defendant's mental health appeared to be deteriorating. A month later, defendant requested a status hearing because he still had not been transported to OSH, he remained in jail, and his condition had further deteriorated. In March 2019, the trial court entered another .365 order, specifying that defendant must be transported to OSH within seven days.

Two weeks after the court entered that .365 order, defendant remained in jail. Defendant's attorney moved to find OSH in contempt, asserting that she had received an email from OSH's attorney indicating that the hospital had no available beds. OSH then moved to vacate the .365 order on the ground that the trial court lacked authority to impose a seven-day deadline for compliance with that type of order. In response to the contempt motion, OSH also asserted that "there were 39 defendants under .370 orders in jail waiting for admission to OSH"; OSH argued that it "[could not]

comply with the 7-day admission requirement in [the] .365 Order without further compromising clear obligations under federal law," referring to the *Mink* seven-day compliance deadline for .370 orders.

After a hearing at which defendant repeatedly interrupted the proceedings, the trial court entered a .370 order for defendant, finding him unable to aid and assist in his defense.[4] The .370 order expressly required defendant to be transported to OSH within seven days.

OSH did not comply. On April 19, 2019—eight days after the .370 order issued—defendant asked the court to hold OSH in contempt because he had not yet been transported to the hospital. An initial hearing was held a few days later, and OSH explained that defendant was still in jail because there was a waiting list for admission of defendants who had been committed to OSH under ORS 161.370. OSH asserted that 45 people were on that waiting list, and defendant was in position number 21. OSH acknowledged its awareness of the .370 order and its noncompliance with the associated seven-day deadline. It asserted, however, that it was unable to comply because of limited resources, claiming that it had done all it could with the resources it had been given. The court scheduled an evidentiary hearing after twice expressing its view that OSH could admit more aid-and-assist patients and was "choos[ing] not to."[5]

The parties submitted written memoranda in anticipation of the evidentiary hearing. In its memorandum, OSH set out the general principles related to remedial contempt proceedings, including that "inability to comply" is an affirmative defense to a contempt allegation (except when that inability is brought on by the contemnor's own contumacious conduct). OSH acknowledged that, when an alleged contemnor "'is able to comply partially with the decree, the

---

[4] The court also determined that OSH was in contempt for violating the .365 order, but it did not impose any sanctions, and the validity of that contempt determination is not at issue on appeal.

[5] The evidentiary hearing that followed related not only to defendant's case, but also involved .370 orders for defendants in other criminal cases. Accordingly, the parties sometimes referred to "defendants" in their filings and arguments. This appeal, however, concerns only OSH's failure to comply with the .370 order issued in the criminal proceeding involving defendant Zamora-Skaar.

law requires that he comply to the extent of his ability.'" (Quoting *State ex rel Fry v. Fry*, 28 Or App 403, 406, 559 P2d 1293 (1977).).

In this case, OSH argued, it was unable to comply with defendant's .370 order even though the hospital was operating at less than 100 percent capacity and had some empty beds. Relying primarily on declarations—and, subsequently, in-person testimony—from OHS's deputy superintendent and OHA's director, OSH offered three types of evidence in support of that argument. First, OSH offered evidence of the "[t]hree populations *** served within OSH," which are not limited to criminal defendants admitted pursuant to .370 orders. In its hearing memorandum, OSH described those populations as follows:

> "(1) Civil commitments, who are people who have been found by the court to be an imminent danger to themselves or others, or who are unable to provide for their own basic health and safety needs due to their mental illness; (2) Guilty Except for Insanity (GEI), people who committed a crime related to their mental illness, and (3) Aid and Assist, people who have been arrested but are not able to participate in their trial because of a mental illness."

OSH offered evidence of the medical, psychiatric, and other services it provides to those patient populations, with the primary goal of helping people recover from mental illness and return to the community.

Second, OSH offered evidence of its efforts to respond to a dramatic increase in the number of criminal defendants who had been committed to OSH "for Aid and Assist treatment" over the past several years. According to OSH's evidence (which defendant did not controvert), the average daily population of such patients was 109 in 2012 and had increased to 264 by the time of the contempt hearing, with 53 defendants waiting for admission. OSH described its response to that increase as including opening new units within OSH to serve the aid-and-assist population, consolidating populations served within existing units, and doubling the total beds available for aid-and-assist patients since 2013. OHA director Allen also averred that, in October 2018, OHA had requested $2.7 million

in emergency funding so it could open additional hospital beds. Instead, the legislature gave OHA only $1.5 million and directed those funds to be "invest[ed] in community programs aimed at reducing the number of Aid and Assist patients sent to the hospital."

Third, OSH presented evidence that patients and staff could suffer harm if additional aid-and-assist patients were admitted under existing conditions. In its hearing memorandum, OSH summarized and explained the general significance of that evidence, particularly as it relates to "managed occupancy limits" that, in accordance with best practices, resulted in not every hospital bed being filled:

> "Setting and following appropriate managed occupancy limits is an industry-wide best practice because filling beds at 100% capacity poses significant safety risks for patients and staff. Occupancy limits not only mitigate safety risks at OSH, it leads to efficient and effective treatment and lower lengths of stay translating to more patients who can be treated within a given year, reduced staff turnover, better patient outcomes, operational flexibility during times of patient clinical crisis, and patients being admitted to the most appropriate beds in a timely manner. Filling beds at rates above an appropriate managed occupancy limit[] has the opposite effect.

> "Operating at 85% capacity is the prevailing standard for both general and psychiatric hospitals. Having acute-needs beds allows facilities to maintain a high quality of care, patient safety, and operational flexibility during times of crisis, and allows for patients to be admitted to the most appropriate beds in a timely manner. This prevailing standard has been established pursuant to empirical research and institutional experience."

OSH asserted that 53 defendants, including the defendant in this case, were waiting for admission to OSH pursuant to .370 orders at the time of the contempt proceedings. It presented evidence supporting its view that admitting any of those defendants would require OSH to either "exceed[] the managed occupancy limits for the type of care prescribed" or "inappropriately discharg[e]" other patients. And exceeding the managed occupancy limits, OSH asserted, would "present[] risks to the safety of patients and staff

and would also reduce the number of patients the hospital is able to serve over a year, as well as having other negative impacts on the system." Accordingly, OSH concluded, it was "unable to admit defendants immediately."

In his written memorandum, defendant argued that OSH's failure to comply with the .370 order was willful because it had chosen not to comply. Defendant asserted that OSH had known for years "about the decreasing bed space, the lack of facilities, and the lack of staff that caused the delays in admission." Defendant further argued that "lack of resources" was not a defense to contempt in this case because OSH, knowing of its increasing need for resources, had "failed to perform any meaningful reform or policy changes to prevent the lack of resources from occurring."

The parties elaborated on their arguments at the contempt hearing. The parties agreed in opening statements that, for violation of a court order to constitute contempt, the violation must have been willful. The parties also agreed that "inability to comply" is an affirmative defense.

In support of his contention that OSH had willfully violated the .370 order, defendant presented (among other evidence) testimony from a lieutenant who was responsible for transporting defendants from the Washington County jail, where defendant was being held, to OSH. The lieutenant explained that the sheriff's office cannot immediately transport a defendant to OSH upon receiving a .370 order: rather, it must wait for notification from OSH that a bed is available. She also confirmed that defendant had not been transported to OSH within seven days after the .370 order issued. In addition, a psychologist testified about the calmer environment and increased level of mental-health services available at OSH as compared to those available at the jail.

For its part, OSH acknowledged that it had violated the .370 order, but it put on evidence aimed at establishing its inability to comply because it was "doing everything it can do to provide treatment to the greatest number of [patients] that it possibly can." During testimony from OSH deputy superintendent Wehr, the trial court interjected questions about OSH patients and operations, including the different

populations served. In response, Wehr testified (among other things) that the hospital had moved aid-and-assist patients into beds in units that had previously served other populations. He provided more detail on that point when direct examination resumed. In addition, Wehr testified that OSH had never filled 100 percent of its beds, asserting that the hospital keeps at least one bed open in each unit.

At that point, the court again interjected, asking how many beds were available throughout OSH that could accept patients under either a .370 or a .365 order. Wehr responded that 533 such hospital beds were available. The court then asked how many of those beds had been full over the preceding month. Wehr testified that, on the day before the contempt hearing, 516 of the 533 beds (or 93.3 percent) were full. The court expressed its view that those figures meant that beds had been available:

> "THE COURT: So I'll round it up for you guys. I think it was a rounding-up number. Ninety-four percent.
>
> "[WEHR]: Yes.
>
> "THE COURT: So understanding that, if I take 553, times it by six percent, I'm going to get an answer of how many beds have been available over the last 30 days."

Wehr went on to testify that it was "really important" not to fill all the beds because OSH needed flexibility to move patients between units, to save space for certain individuals who had to be hospitalized on an expedited basis, to have space in "high-acuity units" for any patients who severely destabilized, and to avoid putting patients in units that were inappropriate for their care. Wehr acknowledged that the hospital already was exceeding the 85 percent occupancy standard that OSH deemed the industry standard, and he testified that it was because OSH "want[ed] to make sure that we can get as many people under .370 orders into [OSH] *** as safely as we possibly can."

OHA director Allen also testified, providing additional detail about the legislative budgeting process, the agency's unsuccessful October 2018 request to the legislature's Emergency Board for additional funding for the aid-and-assist program, and the legislature's decision to

instead provide a lesser amount of funding, designated for community-based restoration. Allen asserted that, even if OSH had received the requested funds for aid-and-assist beds in October 2018, it would have taken at least six months for a new unit to open and be ready to receive patients. Allen also testified that, "[o]n the front end, we need to try to avoid people coming to the hospital at all"; he described the provision of community-based mental-health services as part of that effort.

In closing argument, defendant emphasized that OSH knew of the .370 order and made no effort to comply with it. Defendant also argued that, under *Mink*, the lack of funding could not justify the failure to provide defendant with needed treatment at OSH. In addition, defendant argued, the "inability to comply" affirmative defense was not available to OSH because "[t]here are additional beds that they could be filling." Defendant acknowledged that OSH's resources were limited, but he argued that it was "the choices [OSH] made [that] have led to and contributed to this crisis."

In its closing argument, OSH asserted that the issue before the court was not vindication of defendant's constitutional rights under *Mink* but, rather, whether OSH complied with the .370 order "and if [OSH] didn't, was failure to comply willful, or [was OSH] unable to comply." OSH argued that the evidence showed that it had "been working hard and diligently to comply with *Mink*." It emphasized that admitting more aid-and-assist patients would lead to detrimental overcrowding that would interfere with OSH's obligation "to provide a therapeutic and safe environment." Accordingly, OSH argued, it had been unable to comply with the .370 order.

In rebuttal, defendant again asserted that OSH had not established an affirmative defense because "[t]hey have bed space" and had already violated the 85 percent managed-capacity standard. "Bottom line," defendant argued, "is there are beds" that OSH was "choosing not to fill."

The trial court agreed with defendant and found OSH in contempt. After finding (as the parties essentially agreed) that OSH knew of the .370 order and did not comply

with it, the court set out to discuss whether that violation was "voluntary":

> "Evidence * * * included party opponent admissions by OSH employees that the court was better off converting .365 orders to .370 orders (despite a factual basis) because they were giving priority to the .370 commitment orders due to the *Mink* decision. That OSH was given money from the legislature that they chose to use to fund community restoration in counties other than Washington County. That OSH had beds available but has chosen not to use those beds for the defendants due to resource issues. That OSH did nothing to inform the court or the parties of their non-compliance with the court orders. That OSH has known about the problem for years and especially in the last year as demonstrated by their request for more funding from the legislature (in part which they received and used above and in part which was denied by the legislature). As *Mink* made clear, due to Oregon's statutory scheme, a *voluntary* non-compliance with a court order, hence, violating a defendant's due process rights, cannot be blamed on 'lack of funds, staff, facilities....' [*Mink*, 322 F3d at 1121]. In sum, the evidence was clear that OSH voluntarily and openly chose not to comply with the orders, thus, is in contempt of court."

(Emphasis added.) The court subsequently entered a judgment finding OHA and OSH in contempt and imposing a remedial sanction of $100 for each day that defendant remained in jail from April 19 onward.[6]

### III.  THE PARTIES' ARGUMENTS ON APPEAL

On appeal, OSH acknowledges that the .370 order was lawful and that defendant proved a *prima facie* case for contempt. Nonetheless, OSH argues that the trial court erred in two ways. First, it asserts that the court applied an incorrect legal standard in relation to the "inability to comply" affirmative defense. Specifically, OSH contends that the court erred by "accept[ing] defendant's legal argument that *Mink* prohibited a defense based on lack of resources,

---

[6] The events in this case occurred in early 2019, before the COVID-19 pandemic. A year later, the federal district court entered an order modifying some aspects of the injunction in light of the pandemic. *See Oregon Advocacy Center v. Mink*, 2020 WL 2465331 (D Or, May 13, 2020). That order, which has been appealed to the Ninth Circuit, does not affect our decision here.

concluding that a failure to comply 'cannot be blamed on lack of funds, staff, facilities.'" (Some internal quotation marks omitted.) OSH argues that it was entitled to defend against the contempt motion "based on the lack of resources to comply with the court's .370 order."

Second, OSH contends that some of the trial court's factual findings are not supported by the record. In particular, OSH argues that the record does not support the trial court's finding that OSH had chosen not to use available beds. According to OSH, "the record shows that OSH could not fill every bed within the state hospital because it needed to have space to move patients within the hospital based on the level of care required for an individual patient and to have flexibility for emergencies." OSH asserts that the trial court's "unsupported findings provide an independent basis to reverse the contempt judgment."

In response, defendant argues, among other things, that the trial court applied the law correctly. He contends that an alleged contemnor can establish the affirmative defense of "inability to comply" only by demonstrating that compliance would have been "factually impossible." In defendant's view, the record supports a determination that OSH could have complied with the court order, but it chose not to. He concludes that "[c]ourt orders control over agency policy, even when the agency policy is credibly claimed to be based on a medical decision."

In its reply brief, OSH contends that "impossibility" is not the standard for an "inability to comply" affirmative defense. Relying on a dictionary definition of "inability," OSH argues that a party's lack of resources or capacity can establish that the party is unable to comply with a court order.[7] In this case, OSH contends, it "should be excused from meeting the deadline in light of the surge of .370 orders that overwhelmed the hospital, the resource constraints over which the hospital has no control, and the lack of bed space, lack of staff, and lack of funding to safety and effectively admit all defendants subject to a .370 order within seven days."

---

[7] OSH relies on *Webster's*, which defines "inability" to include "the quality or state of being unable : lack of ability : lack of sufficient power, strength, resources, or capacity." *Webster's Third New Int'l Dictionary* 1139 (unabridged ed 2002).

## IV.  ANALYSIS

### A.  *Remedial Contempt Proceedings, Generally*

Contempt proceedings are governed by statute. "Contempt of court" is defined to include disobedience of a court order. ORS 33.015(2). A party aggrieved by an alleged contempt of court may initiate a contempt proceeding seeking to impose remedial sanctions. ORS 33.055(2)(a). The party initiating the proceeding must prove (1) that a valid court order exists, (2) the alleged contemnor's knowledge of the order, and (3) the alleged contemnor's willful noncompliance with that order. *State v. Welch*, 295 Or App 410, 416-17, 434 P3d 488 (2018). To prove that the alleged contemnor's noncompliance was "willful," the party initiating the contempt proceedings need show only that the noncompliance was intentional "and with [the] knowledge that the act or omission was forbidden conduct." *Welch*, 295 Or App at 417; *see State v. Nicholson*, 282 Or App 51, 62, 383 P3d 977 (2016) (similar). A separate showing of "bad intent" is not required. *Welch*, 295 Or App at 417. Thus, evidence showing a knowing violation is enough to support an inference of willfulness. *Id*. Put differently, "[a] party's noncompliance with a court order is willful when it is voluntary, that is, a choice by the party not to comply." *Chong Ok Chang v. Eun Hee Chun*, 305 Or App 144, 152, 470 P3d 410 (2020).

An alleged contemnor may, however, raise an affirmative defense of inability to comply with the court order. ORS 33.055(10) ("Inability to comply with an order of the court is an affirmative defense."). At least in certain contexts, proof of a financial inability to comply can establish the affirmative defense. *See, e.g.*, *State ex rel Mikkelson v. Hill*, 315 Or 452, 458, 847 P2d 402 (1993) (inability to pay is an affirmative defense in a criminal contempt proceeding based on a parent's failure to make child support payments). The alleged contemnor has the burden to establish inability to comply; the party initiating the contempt proceeding need not prove the converse. *See Marriage of Altenhofen and Vanden-Busch*, 271 Or App 57, 60, 349 P3d 655, *rev den*, 358 Or 449 (2015) (the contempt defendant has the burden of establishing the affirmative defense of inability to comply); *Clark and Clark*, 171 Or App 205, 210, 14 P3d 667 (2000) (the

party initiating the contempt proceeding need not disprove the affirmative defense). Moreover, when a party is able to comply at least in part with a court's order, that party may be held in contempt for failure to comply to the best of its ability:

> "'If the defendant is able to comply partially with the decree, the law requires that he comply to the extent of his ability.' *State ex rel Fry v. Fry*, 28 Or App 403, 406, 559 P2d 1293 (1977). Thus, where a defendant could not fully comply with a support order, but had some money that he could have, but failed to, apply toward his support obligation, that defendant may be properly held in contempt."

*Altenhofen*, 271 Or App at 61 (some citations omitted).

When a party's willful noncompliance with a court order has been proved (and no affirmative defense established), "it is for the trial court's discretion whether remedial sanctions, if any, are appropriate[.]" *Elizabeth Lofts Condo Owners' v. Victaulic Co.*, 293 Or App 572, 581, 428 P3d 952 (2018).

B.  *OSH's Argument that the Trial Court Incorrectly Applied the Law*

OSH first argues that the trial court "applied an incorrect legal standard when it concluded that the *Mink* opinion *** precluded OSH from asserting that it was unable to comply with the court's order due to a lack of resources, such as bed space, staffing, and funding." Before addressing that argument, we pause to clarify what OSH is *not* arguing in this appeal.

First, OSH does not dispute that the evidence supports the trial court's determination that OSH willfully violated the .370 order. Nor does it contend that the trial court incorrectly applied the law when considering whether defendant had established a *prima facie* case that OSH was in contempt. Thus, the only issues on appeal relate to whether OSH established the affirmative defense of "inability to comply."

Second, OSH does not argue that the evidence was such that the trial court was required to find that OSH had established that affirmative defense. Put differently, OSH

does not argue that the evidence of OSH's resource limitations, its efforts to accommodate increasing numbers of "aid and assist" patients, industry standards, and the 93.3 percent bed-occupancy rate *compelled* a determination that OSH was unable to comply with the seven-day deadline in the .370 order.[8]

Rather, we understand OSH's argument to be confined to an assertion that the trial court applied an incorrect legal standard when it considered whether OSH had established the affirmative defense. In the context of a bench trial, that type of argument is akin to an assertion that a trial court delivered an incorrect jury instruction. Accordingly, we review both to determine whether the court instructed itself incorrectly regarding the law and whether any erroneous self-instruction was harmless. *See State v. Carillo*, 304 Or App 192, 202-06, 466 P3d 1023, *rev den*, 367 Or 220 (2020) (applying that analysis); *State v. Colby*, 295 Or App 246, 251-52, 433 P3d 447 (2018) (discussing ways in which a party may raise questions about elements of a claim and how a trial court may "instruct itself on the correct version of the law").

A jury instruction—or a court's self-instruction—is erroneous if it "communicate[s] *** an inaccurate legal rule to apply to the facts." *State v. Morales*, 307 Or App 280, 287, 476 P3d 965 (2020). When an erroneous instruction was given during a jury trial, we evaluate whether the error was harmless by considering the parties' contentions at trial, the jury instructions as a whole, and how the parties' theories of the case developed, with the ultimate question being whether there is little likelihood that the error affected the jury's verdict. *Id*. at 289. By analogy, when considering

---

[8] In any event, any such argument likely would not be preserved for appeal. OSH argued vigorously to the trial court that—as a factual matter—it was unable to comply with the .370 order and the court should not impose contempt sanctions. However, OSH did not move for a directed verdict on the affirmative defense, it did not move for involuntary dismissal of the contempt allegation, and it did not otherwise argue to the trial court that the court was required, *as a matter of law*, based on the evidence presented, to find that OSH was unable to comply with the order and therefore was not in contempt. *Cf. Ortega v. Martin*, 293 Or App 180, 194, 427 P3d 1003 (2018), *vac'd on other grounds*, 366 Or 760, 468 P3d 945 (2020) (to be entitled to a directed verdict based on an affirmative defense, the defendant must establish "that all reasonable factfinders would have to find in the [defendant's] favor on that defense").

whether a trial court's erroneous self-instruction was harmless (or, conversely, constitutes reversible error), we must determine whether there is little likelihood that the erroneous self-instruction affected the court's verdict, considering the parties' arguments, the court's statements regarding the pertinent law, and how the parties' theories of the case developed over time.

We take that contextual approach in evaluating OSH's argument that the trial court applied an incorrect legal standard in association with the "inability to comply" affirmative defense, noting that we perceive three separate aspects to OSH's argument. First, OSH broadly asserted, during oral argument to this court, that the trial court "refus[ed] to consider the [OSH's] affirmative defense of inability to comply with the trial court's order." We disagree. Defendant acknowledged that "inability to comply" is an affirmative defense to a contempt allegation, and the trial court never suggested that it believed, as a matter of law, that OSH was precluded from attempting to establish that affirmative defense. In short, nothing in the record indicates that the trial court erroneously refused to consider whether OSH had established an affirmative defense. The court simply concluded that OSH had not done so.

Before discussing the second and third aspects of OSH's argument, we note that—despite both parties having acknowledged that "inability to comply" is an affirmative defense—neither party focused on the distinction between defendant's *prima facie* contempt case and OSH's affirmative defense in framing their arguments for the trial court. To the contrary, both parties often seemed to treat willfulness and inability to comply as two sides of the same coin, with OSH asserting, for example, that the question before the trial court was whether its failure to comply with the .370 order "was *** willful, or were we unable to comply." We remark on that apparent conflation of the issues in the trial court because, as discussed below, it informs how we read the court's decision.

The second part of OSH's argument on appeal is narrower than the first. OSH asserts that the trial court erroneously precluded it from relying on a lack of resources

to establish the affirmative defense of inability to comply. OSH contends that, in this proceeding, as in at least some other types of contempt proceedings, the alleged contemnor's financial inability to comply with a court order precludes a contempt determination. According to OSH, the trial court precluded OSH from establishing that kind of "lack of resources" defense by inappropriately importing a standard from *Mink*—which addressed criminal defendants' due-process interests—into the different context of contempt proceedings:

> "Relying on *Mink*, and as defendant had argued, the court rejected OSH's assertion that it was unable to comply with the seven-day admission deadline because it lacked the resources to safely and appropriately treat defendant. The court concluded:
>
>> "'*** As *Mink* made clear, due to Oregon's statutory scheme, a voluntary non-compliance with a court order, hence, violating a defendant's due process rights, cannot be blamed on "lack of funds, staff, facilities ***." [*Mink*, 322 F3d at 1121]. In sum, the evidence was clear that OSH voluntarily and openly chose not to comply with the orders, thus, is in contempt of court.'"

The state emphasizes that *Mink* was not a contempt case and that the Ninth Circuit's opinion "said nothing about contempt defenses under state law."

For the purpose of considering OSH's argument, we assume—without deciding—that OSH is correct that it could not properly be held in contempt if it established that it was actually unable to comply with the .370 order, even if that inability to comply was caused by a lack of financial resources. However, we are not persuaded that the trial court's reference to *Mink*, quoted above, indicates that the trial court's contempt determination was based on a contrary understanding of the law.

The trial court's citation to *Mink* cannot properly be viewed in isolation; rather, it must be considered in the larger context of the multiple court proceedings related to defendant's deteriorating mental state, the court's repeated attempts (using both .365 and .370 orders) to have defendant admitted to OSH, and the parties' framing of the issues.

True, during the course of those proceedings, OSH refer-enced its unsuccessful efforts to obtain additional funding for aid-and-assist beds in October 2018, defendant relied on *Mink* for the proposition that lack of resources could not jus-tify OSH's noncompliance with the .370 order, and the court cited *Mink* for the proposition that a lack of resources could not justify "voluntary non-compliance" with such an order. Nonetheless, considering the entire context of the case, we are not persuaded that the court's decision suggests that it was rejecting, as a matter of law, the possibility that OSH could establish "inability to comply" by proving that a lack of resources really left it unable to comply with the court's order.

Importantly, the trial court did *not* state that, under *Mink*, an actual inability to comply with the .370 order could not constitute an affirmative defense if that inability was caused by a lack of resources. Also importantly, the court did not find—as a factual matter—that OSH was unable to comply with the order. That is (and stating those two ideas together), the court did *not* determine that (1) OSH was unable to comply, but (2) that—because of *Mink*—that inability could not constitute an "inability to comply" affir-mative defense under ORS 33.055(10) if it was caused by a lack of resources.

Rather, in referring to *Mink*, the trial court expressed its understanding that OSH's "*voluntary* non-compliance" with the .370 order could not be excused by a lack of resources. (Emphasis added.) The court's use of the word "voluntary" is important, particularly in light of the court's repeated suggestions that it believed that the exis-tence of vacant hospital beds suitable for aid-and-assist patients showed that OSH could have complied with the .370 order, but had chosen not to. In context, we view the court as having used the word "voluntary" in conjunction with the only disputed issue the court was asked to decide—whether OSH had established that it was unable to comply with the order.[9] Thus, we understand the court's reference to *Mink*

---

[9] We acknowledge that, under our case law, whether a party's violation of a court order is voluntary relates to the willfulness element of a *prima facie* case for contempt. *Chong Ok Chang*, 305 Or App at 152. However, the parties did not frame their arguments to the trial court in terms of voluntariness, much less

as reflecting only its belief that a lack of resources could not justify *voluntary* noncompliance, that is, noncompliance when compliance would have been possible notwithstanding OSH's resource issues.

Moreover, even if the trial court's reference to *Mink* reflected a mistaken belief that an alleged contemnor can *never* establish an "inability to comply" affirmative defense if the inability is based on a lack of resources, we would view that self-instruction error as harmless in this case.[10] Although the parties and the court discussed the absence of legislative funding for additional aid-and-assist beds, the trial court's decision was not centered on that lack of funding. Nor was the court focused on whether, if OSH had received additional financial resources, it might have been able to open more beds for that patient population. Rather, as the court's statements and its questioning of OSH's witnesses demonstrates, the court was primarily—and fundamentally—focused on whether OSH could have admitted defendant to the hospital given existing facilities and the uncontested fact that dozens of hospital beds were unoccupied at the time of the contempt hearing.

Thus, the court's decision was based on its determination, as a matter of fact, that OSH could have admitted defendant to the hospital in keeping with the .370 order and that it chose not to. The court did not base its decision on a determination that OSH could not admit defendant, but nonetheless was not entitled to an "inability to comply" affirmative defense because its inability was due to a lack of resources. Accordingly, even if the trial court misunderstood *Mink* as precluding an affirmative defense under such circumstances, it does not matter, because those are not the circumstances that the court found to exist in this case. We conclude that there is little likelihood that the trial court's

---

confine that concept to the *prima facie* case. Moreover, as noted above, the parties often conflated the willfulness standard and the affirmative defense of inability to comply. Thus, the court's use of the word "voluntary" cannot fairly be understood to refer only to whether OSH's noncompliance was willful—a point that OSH ultimately conceded.

[10] Again, we assume for purposes of our analysis—without deciding—that OSH could not properly be held in contempt if it established that a lack of financial resources left it unable to comply with the .370 order.

decision was affected by any mistaken understanding of *Mink*. In other words, any such error was harmless.

Although it is not entirely clear, there appears to be a third aspect to OSH's argument that the trial court incorrectly precluded OSH from basing its "inability to comply" affirmative defense on a lack of resources. Despite asserting that the trial court applied the wrong legal standard, OSH does not expressly articulate what legal test the trial court should have applied when considering whether OSH was unable to comply with the .370 order. At times, however, OSH seems to suggest that it could prove "inability to comply"—despite the trial court's finding that about six percent of beds suitable for aid-and-assist patients remained available—by establishing that the limited number of aid-and-assist beds at the state hospital resulted from a lack of financial resources and that it would be inadvisable to fill all of those beds.

For example, OSH asserts in its reply brief that "factual impossibility" is not the standard for an "inability to comply" affirmative defense. Relying on a dictionary definition, OSH argues that "inability" can connote a lack of resources or capacity. OSH then describes the evidence that, OSH contends, demonstrates that OSH "was taking every reasonable step to admit patients as quickly and safely as possible."

OSH does not expressly connect the dots between that evidence and any legal test for the "inability to comply" affirmative defense that differs from a "factual impossibility" standard. But, to the extent that we can discern a connecting rationale, it is a suggestion that the trial court was required to accept OSH's professional judgment that admitting additional aid-and-assist patients (filling some or all of the vacant beds) would have created unacceptable safety risks and harm to both patients and staff—risks and harm so great that OSH should be deemed unable to comply with the .370 order.

Perhaps the trial court could have accepted OSH's judgment on those matters and declined, for that reason, to impose contempt sanctions. But OSH's suggestion that the trial court was *required* to accept OSH's judgment is

problematic, at least in the context of this case. As an initial matter, the question of what legal standard applies to an "inability to comply" affirmative defense (if the standard is something other than "factual impossibility") is not properly before us on appeal, as the parties did not litigate that issue below, but simply agreed that "inability to comply" is an affirmative defense.[11] Moreover, we remain uncertain exactly what legal standard OSH would have courts apply in relation to that issue. Is the rule that a court determining whether a government agency should be held in contempt for violating a court order must always accept that agency's judgment about whether compliance would create health and safety risks? Or must the court accept the agency's judgment if no party puts on evidence contradicting the agency's evidence about the advisability of compliance (despite the agency having the burden of proof on the affirmative defense)? Is the court supposed to weigh the harms that the agency says would result from compliance against the different harms caused by the agency's failure to comply? If so, what standard governs that balance? Does some sort of "reasonableness" standard come into play at any point in the analysis? What about consideration of whether the agency acted in good faith? Or does "inability to comply," which, after all, is a statutory term, ORS 33.055(10), implicate other, perhaps completely different, considerations?

Those legal questions are important, and they are challenging. But the parties did not litigate those issues in the trial court. Nor have the parties directly confronted those issues in this appeal. That is, the parties have not developed arguments about what test a court should apply to determine whether an alleged contemnor has established

---

[11] Indeed, to the limited extent that OSH identified a legal standard in its hearing memorandum, it was by citing a case that equated "inability to comply" with "impossibility":

"Inability to comply with the court's order is an affirmative defense to remedial contempt. ORS 33.055(10). 'It is not the policy of the law to punish a man for failure to do something which is impossible; consequently, defendant's inability to [comply], if established, would be a complete defense unless [the defendant] had in bad faith rendered himself unable to do so.' *State ex rel Wolf v. Wolf*, 11 Or App 477, 480[, 503 P2d 1255] (1972)."

(Some citations omitted.) Thus, not only did OSH not alert the trial court to any meaning of "inability to comply" other than a "factual impossibility" standard, it could be argued that OSH invited any associated error.

"inability to comply" if that test is something other than "factual impossibility." Accordingly, we do not address that issue further in this case, beyond noting that—to the extent that OSH contends that some standard other than "factual impossibility" applies—OSH has not identified either what that standard is or the basis for it.

In short, we conclude that OSH has not established that the trial court based its rejection of OSH's "inability to comply" affirmative defense on an incorrect understanding of the law. OSH's argument on that point does not present a ground for reversal.

C.   *OSH's Challenge to Certain Factual Findings*

We turn to OSH's contention that the record does not support some of the trial court's factual findings. In an argument related to the one we already have rejected, OSH asserts that the record does not support the court's finding that "OSH had beds available but has chosen not to use those beds for the defendants due to resource issues." OSH contends that the finding is erroneous because the evidence shows that it had good reasons for not filling every bed, such as maintaining flexibility for emergencies, maintaining occupancy limits to ensure the safety of patients and staff, and ensuring that patients received effective treatment. We disagree with OSH's contention that its evidence undermines the court's finding. The testimony of OSH's own witnesses supports a finding that the hospital had not filled dozens of beds that could have been used to provide a hospital level of care for aid-and-assist patients. The record also supports the court's finding that OSH "chose" not to use those beds. That choice may well have been based on a sound and good-faith exercise of professional judgment that resulted in OSH accommodating as many aid-and-assist patients as it believed was consistent with health and safety concerns, but it nonetheless remained a choice.

OSH also contends that the record does not support three other findings by the trial court: (1) that OSH employees admitted "that the court was better off converting .365 orders to .370 orders (despite a lack of factual basis) because they were giving priority to the .370 commitment orders due

to the *Mink* decision"; (2) that "OSH did nothing to inform the court or the parties of their noncompliance with the court orders"; and (3) that "OSH has known about the problem for years and especially in the last year as demonstrated by their request for more funding from the legislature." Having reviewed the entirety of the record, and having considered the evidence and arguments that led to the three challenged findings, we conclude that the record supports each of those findings. We reject OSH's challenge to them without further discussion.

Affirmed.